## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DINA A. HOHMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ILG, INC., CRAIG M. NASH, DAVID FLOWERS, VICKI L. FREED, LIZANNE GALBREATH, CHAD HOLLINGSWORTH, LEWIS J. KORMAN, THOMAS J. KUHN, THOMAS J. MCINERNEY, THOMAS P. MURPHY, JR., STEPHEN R. QUAZZO, SERGIO D. RIVERA, THOMAS O. RYDER, AND AVY H. STEIN,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT – CLASS ACTION FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Dina A. Hohman ("Plaintiff"), by and through her undersigned counsel, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of herself and all other similarly situated public shareholders of ILG, Inc. ("ILG" or the "Company") against ILG and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with ILG, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and

78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9, 17 § C.F.R. 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of ILG by Marriott Vacations Worldwide Corporation ("MVW") and its affiliates.[1]

2.      On April 30, 2018, the Board caused the Company to enter into an Agreement and Plan of Merger ("Merger Agreement"), pursuant to which ILG shareholders will receive 0.165 shares of MVW common stock and $14.75 in cash, without interest (the "Merger Consideration"), for each share of ILG common stock that they own.

3.      On July 24, 2018, in order to convince ILG's shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading proxy statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for ILG; (ii) the valuation analyses conducted by the Company's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and

---

[1]      The Proposed Transaction will be consummated through a series of transactions:

●      first, Ignite Holdco Subsidiary, Inc. ("Ignite Merger Sub"), a wholly-owned direct subsidiary of Ignite Holdco, Inc. ("Holdco"), a wholly-owned direct subsidiary of ILG, will be merged with and into ILG, with ILG surviving the merger as a wholly-owned subsidiary of Holdco;

●      second, ILG will be converted from a Delaware corporation to a Delaware limited liability company;

●      third, Volt Merger Sub, Inc. ("Volt Corporate Merger Sub"), a wholly-owned direct subsidiary of MVW, will be merged with and into Holdco, after which Holdco will survive the merger as a wholly-owned subsidiary of MVW; and

●      finally, Holdco will be merged with and into Volt Merger Sub, LLC ("Volt LLC Merger Sub"), a wholly-owned direct subsidiary of MVW, with Volt LLC Merger Sub surviving the merger as a wholly-owned subsidiary of MVW.

2

Moelis & Company LLC ("Moelis"), in support of their fairness opinions; and (iii) the potential conflict of interest faced by Goldman Sachs and Moelis.

5.     The special meeting of ILG shareholders to vote on the Proposed Transaction is scheduled for August 28, 2018 (the "Shareholder Vote").  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the Shareholder Vote so that they can properly exercise their corporate suffrage rights.

6.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the Shareholder Vote and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to ILG's shareholders sufficiently in advance of the Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**PARTIES**

7.     Plaintiff is, and has been at all relevant times, a shareholder of ILG common stock.

8.     Defendant ILG, a Delaware corporation, is a leading provider of professionally delivered vacation experiences and the exclusive global licensee for the Hyatt, Sheraton, and Westin brands in vacation ownership.  ILG operates in two segments: Vacation Ownership and Exchange and Rental.  ILG common stock trades on the NASDAQ under the ticker symbol "ILG."

9.      Defendant Craig M. Nash is, and has been at all relevant times, a director of ILG, and currently serves as the Company's Chairman of the Board, President, and Chief Executive Officer.

10.     Defendant David Flowers is, and has been since August 2008, a director of ILG.

11.     Defendant Vicki L. Freed is, and has been since October 2012, a director of ILG.

12.     Defendant Lizanne Galbreath is, and has been since May 2016, a director of ILG.

13.     Defendant Chad Hollingsworth is, and has been since February 2015, a director of ILG.

14.     Defendant Lewis J. Korman is, and has been since August 2008, a director of ILG.

15.     Defendant Thomas J. Kuhn is, and has been since August 2008, a director of ILG.

16.     Defendant Thomas J. McInerney is, and has been since May 2008, a director of ILG.

17.     Defendant Thomas P. Murphy, Jr., is, and has been since August 2008, a director of ILG.

18.     Defendant Stephen R. Quazzo is, and has been since May 2016, a director of ILG.

19.     Defendant Sergio D. Rivera is, and has been since May 2016, a director of ILG.

20.     Defendant Thomas O. Ryder is, and has been since May 2016, a director of ILG.

21.     Defendant Avy H. Stein is, and has been since August 2008, a director of ILG.

22.     The parties in paragraphs 9 through 21 are referred to herein as the "Individual Defendants" and/or the "Board," collectively with ILG the "Defendants."

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

24.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District under 28 U.S.C. § 1391, because ILG is incorporated in this District, some of the transaction and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the other public common shareholders of ILG (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

27.     This action is properly maintainable as a class action because:

a)  the Class is so numerous that joinder of all members is impracticable.  As of July 13, 2018, there were 124,310,401 shares of ILG common stock outstanding, held by hundreds to thousands of individuals and entities

scattered throughout the country.  The actual number of public shareholders of ILG will be ascertained through discovery;

b) there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

    i.    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

    ii.    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual

members of the Class, which would establish incompatible standards of
conduct for the party opposing the Class;

f)  Defendants have acted on grounds generally applicable to the Class with
respect to the matters complained of herein, thereby making appropriate the
relief sought herein with respect to the Class as a whole; and

g)  a class action is superior to other available methods for fairly and efficiently
adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.  Background of the Company and the Proposed Transaction**

28.    ILG, a Delaware corporation, is a leading provider of professionally delivered
vacation experiences and the exclusive global licensee for the Hyatt, Sheraton, and Westin
brands in vacation ownership.  ILG operates in two segments: Vacation Ownership and
Exchange and Rental.

29.    MVW, a Delaware corporation, is the exclusive worldwide developer, marketer,
seller, and manager of vacation ownership and related products under the Marriott Vacation Club
and Grand Residences by Marriott brands, as well as under Marriott Vacation Club Pulse, an
extension of the Marriott Vacation Club brand.  MVW is also the exclusive worldwide
developer, marketer, and seller of vacation ownership and related products under The
Ritz-Carlton Destination Club brand, and has the non-exclusive right to develop, market, and sell
whole ownership residential products under The Ritz-Carlton Residences brand.  The
Ritz-Carlton Hotel Company, a subsidiary of Marriott International, provides on-site
management for Ritz-Carlton branded properties.

30.     On April 30, 2018, ILG and MVW issued a joint press release announcing the

Proposed Transaction.  The press released, stated in relevant part:

### Marriott Vacations Worldwide to Acquire ILG to Create a Leading Global Provider of Premier Vacation Experiences

*Leading upper-upscale and luxury vacation ownership and exchange company will have over 100 vacation properties around the world and approximately 650,000 owners*

*Exclusive access to the world-class customer loyalty programs of Marriott International and Hyatt for vacation ownership*

*Global licensee of seven upper-upscale and luxury vacation brands including Marriott Vacation Club, Grand Residences by Marriott, Ritz-Carlton Destination Club, Sheraton Vacation Club, Westin Vacation Club, St. Regis Residence Club and Hyatt Residence Club*

*Premier exchange networks with nearly two million members and over 3,200 resorts worldwide*

*Combined company will have pro-forma revenues of $2.9 billion and a diversified and complementary*

*platform with significant contribution from recurring and fee-based revenue streams*

*Transaction structured to maintain strong and flexible balance sheet  that will support future growth and shareholder returns*

*Expected to be accretive to MVW's adjusted earnings per share within the first year after close, with annual run-rate cost savings of at least $75 million within two years following close*

*Companies to host conference call and webcast today at 8:00 a.m. Eastern Time*

ORLANDO, Fla. and MIAMI – April 30, 2018 – Marriott Vacations Worldwide Corporation (NYSE: VAC) ("MVW" or the "Company") and ILG, Inc., (Nasdaq: ILG) ("ILG") today announced that they have entered into a definitive agreement under which MVW will acquire all of the outstanding shares of ILG in a cash  and  stock  transaction  with  an  implied  equity  value  of

approximately $4.7 billion. Under the terms of the agreement, ILG shareholders will receive $14.75 in cash and 0.165 shares of MVW common stock for each ILG share.

ILG is a leading provider of premier vacation experiences with over 40 properties and over 250,000 owners in its Vistana Signature Experiences and Hyatt Vacation Ownership portfolios, as well as exchange networks that comprise nearly two million members and over 3,200 resorts worldwide. As a combined entity, MVW and ILG will be a leader in the vacation experiences industry with significant scale, an expanded presence in key leisure destinations, the largest portfolio of upper-upscale and luxury brands in the industry and world-class exchange networks. The combined company will be the global licensee of seven upper-upscale and luxury vacation brands, including Marriott Vacation Club, Grand Residences by Marriott, Ritz-Carlton Destination Club, Sheraton Vacation Club, Westin Vacation Club, St. Regis Residence Club, and Hyatt Residence Club. It will also have exclusive access for vacation ownership to the Marriott Rewards, Starwood Preferred Guest and Ritz-Carlton Rewards loyalty programs for its six Marriott vacation ownership brands. With respect to its Hyatt business, the combined company will have rights to develop, market and sell under the Hyatt Vacation Ownership programs, including access to the almost 10 million members of the World of Hyatt loyalty platform. Finally, strengthening MVW's vacation properties' affiliation with ILG's exchange networks will reinforce Interval International's industry leading position and advance our objective of creating shareholder value.

"This transaction will combine two of the premier global vacation ownership companies to create a more diversified company with significantly enhanced marketing potential and scale to drive sales growth and value for both MVW and ILG shareholders," said Stephen P. Weisz, President and Chief Executive Officer of Marriott Vacations Worldwide. "With ILG, we will bring together six world-class vacation ownership brands under one licensing relationship with Marriott International, which will enable us to leverage high-value marketing and sales channels, including those provided by Marriott International's platforms, and enhance the benefits of our access to Marriott International's loyalty programs, call transfer and hotel linkage programs. We will also diversify our vacation ownership business with the addition of the Hyatt Vacation Ownership platform, providing exciting growth opportunities outside of the Marriott and Vistana platforms.

Additionally, with ILG's leading exchange networks, we will gain recurring, high-margin revenue streams."

Mr. Weisz continued, "ILG shares our dedication to customers and commitment to creating an unparalleled vacation experience for our Owners. Together, I am confident that we will be better positioned to fulfill the dreams of Owners, Members and guests around the world by providing them with memories that will last a lifetime."

"We are very pleased to achieve this outcome for shareholders, as it provides them with immediate and compelling cash value and the opportunity to meaningfully participate in the long-term growth potential of a powerful combined company," said Craig M. Nash, Chairman, President and Chief Executive Officer of ILG. "The strategic rationale for this transaction is clear. Combining these two highly complementary businesses will create an industry leader with enhanced scale and a broader product portfolio that will have great benefits for our members, owners and guests. Thanks to the dedication and hard work of our more than 10,000 talented associates around the world, we have been able to successfully adapt to changing industry dynamics throughout our history, and this transaction is another step in that evolution. MVW associates share the same values and goals that we have championed for so long, and we are confident that MVW and ILG are as strong a cultural fit as they are strategic."

**Compelling Strategic and Financial Benefits**

- **Creates a leading global luxury and upper-upscale vacation ownership operator with access to world-class loyalty programs and an expanded portfolio of highly demanded vacation destinations:** Combining MVW and ILG will create a leading global vacation ownership and exchange company comprising approximately 650,000 owners, seven upper-upscale and luxury brands, over 100 vacation properties and more than 20,000 vacation ownership units around the world. With ILG's four resorts in Mexico and one on St. John (USVI), MVW will gain an important foothold in popular vacation destinations in Mexico and expand its presence in the Caribbean. Additionally, it will diversify its long history of upper-upscale brand management with the Hyatt Residence Club properties. ILG's resort management businesses across the U.S., Caribbean, Mexico and Europe will also significantly

expand MVW's resort management capabilities and scope across the globe.

- **Creates a platform to accelerate sales growth:** Through their agreements with Marriott International, MVW and ILG will have exclusive access for vacation ownership to the Marriott Rewards, Starwood Preferred Guest and Ritz-Carlton Rewards loyalty programs, which have over 100 million members and which are expected to be combined into a single loyalty program in early 2019. They will also be able to leverage the exclusive call transfer and hotel linkage rights that MVW gained through its recently amended agreement with Marriott International to drive valuable incremental tours and sales at ILG's Vistana properties, significantly enhancing the sales potential of these locations. In addition to these opportunities, the Hyatt Vacation Ownership business will benefit from continued access to almost 10 million World of Hyatt loyalty platform members for marketing opportunities and growth in highly desirable destinations.

- **Diversifies revenues and expands margins with significant contribution from recurring and fee-based revenue streams:** The Company will benefit from premier exchange networks, which provide incremental, high-margin, recurring, fee-based revenue streams. ILG's Interval International, Vistana Signature Network, Hyatt Residence Club and Trading Places International exchange networks will comprise nearly two million members and over 3,200 resorts.

  ILG's exchange networks and resort management business represent profitable revenue streams that will further diversify the Company's revenue profile and expand its margins. Additionally, owning Marriott Vacation Club, Vistana Signature Experiences and Hyatt Vacation Ownership, which on a combined basis represent over 50% of the corporate members of Interval International, will provide increased stability of cash flows from this business. The additional revenue streams that ILG would bring to the combined company would raise its total 2017 revenue to $2.9 billion while further diversifying its revenue mix.

  Interval International, ILG's leading exchange business, will maintain its headquarters in Miami, Florida, where it has been based since its founding in 1976. Marriott Vacations Worldwide has deep respect for the Interval International

leadership team and looks forward to working with them as the combined company take steps to grow this business into the future.

- **Transaction structure will result in a strong and flexible balance sheet to support future growth and shareholder returns:** The combination will significantly enhance and diversify MVW's cash flows. ILG will contribute strong and recurring revenue streams that will enable the combined company to maintain flexibility for continued organic growth, strategic acquisitions, continued capital returns to shareholders and de-levering. On a pro-forma basis, the combined company would have 2017 adjusted EBITDA of $737 million[1]. Over the past four years, MVW has returned $775 million to its shareholders through dividends and share repurchases, and it expects to pay a pro-forma annual dividend of $1.60 per share following the close of the transaction.

- **Immediately accretive to MVW's earnings and free cash flow profile and generates significant near-term cost savings:** The transaction is expected to be accretive to MVW's adjusted earnings per share within the first full year after close. It has identified and expects to achieve at least $75 million of annual run-rate cost savings within two years following the close of the transaction. Savings are expected to come primarily from the rationalization of redundant general and administrative, operating and public company costs.

## Integration Planning and Leadership

Marriott Vacations Worldwide's President and Chief Executive Officer, Mr. Stephen Weisz, and its Chief Financial and Administrative Officer, Mr. John Geller, will continue to serve in their roles following the close of the transaction. The Marriott Vacations Worldwide Board of Directors will be expanded from eight to 10 members to include two current members of the ILG Board, and Mr. William Shaw will remain Chairman of the Board. MVW's headquarters will remain in Orlando, and the combined company will maintain a significant operating presence in Miami. Following the close of the transaction, the combined company will trade on the NYSE under ticker symbol VAC.

## Transaction Details

> Under the terms of the merger agreement, which has been unanimously approved by the Boards of both companies, ILG shareholders will receive $14.75 in cash and 0.165 shares of MVW common stock for each ILG share. Following the close of the transaction, ILG shareholders will own approximately 43% of MVW's common shares on a fully-diluted basis, based on the number of MVW common shares outstanding today. Qurate Retail, Inc. has entered into a voting agreement with ILG in support of the transaction.
>
> MVW has received financing commitments from J.P. Morgan and BofA Merrill Lynch. The completion of the transaction is not subject to a financing contingency.[2]

31.   It is imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Transaction.

## II.   The Materially Incomplete and Misleading Proxy

32.   On July 24, 2018, ILG filed the Proxy with the SEC in connection with the Proposed Transaction.   The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.   The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

---

[2]   ILG, Inc., Current Report (Form 8-K), at Exhibit 99.1 (Joint press release issued April 30, 2018 by ILG, Inc. and Marriott Vacations Worldwide Corporation, announcing their entry into the Merger Agreement.) (April 30, 2018).

33.     First, while the Proxy fails to fully disclose the financial projections for ILG. Indeed, the Proxy discloses that the Company updated forecasts that were initially prepared by ILG management in April 2017, *see* Proxy at 62, and subsequently updated in December 2017, *see id.* at 65, February 2018, *see id.* at 67, and April 2018, *see id*. at 72. However, the previous iterations of ILG's financial projections are not disclosed.

34.     Furthermore, the Proxy wholly fails to disclose what changes were made in the subsequent revisions of the Company's forecasts. Such information is particularly important in light of the fact that FrontFour Capital Group LLC ("FrontFour")—a known activist shareholder—repeatedly and publicly announced its desire that the Board enter into a business combination between ILG and MVW. *See* Proxy at 63 ("On May 24, 2017, [FrontFour], a stockholder in ILG, issued a public letter to ILG's Board calling for a business combination between ILG and MVW"); *id.* at 65 ("On November 27, 2017, ILG's Board received a letter from FrontFour in which FrontFour urged ILG's Board to pursue a combination with MVW."); *id.* at 67 ("Also on February 21, 2018, FrontFour released a public letter to the stockholders of ILG, urging ILG to pursue a business combination with MVW, and asserting its support for its four director nominees."). Indeed, the projections were repeatedly revised throughout FrontFour's public requests and the Board hired a second financial advisor—Goldman Sachs—specifically in response to "continued shareholder activism." *See* Proxy at 64.

35.     However, the Proxy fails to disclose any of the earlier sets of projections that were prepared by ILG management, relied upon by the Board during the sales process, and even utilized by Goldman Sachs and Moelis in their preliminary financial analyses of ILG. Consequently, shareholders are unable to determine whether the projections were modified in a

manner that does not reflect the Company's true value and, instead, were adjusted in response to pressure exerted by FrontFour and, ultimately, force a sale of the Company to MVW.

36.     If a proxy statement discloses financial projections and valuation information, such projections must be **complete and accurate**.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

37.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis—ILG Standalone*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 9.5% to 11.0%; (ii) the range of ILG's illustrative terminal values as of June 30, 2022; (iii) the inputs and assumptions underlying the calculation of the perpetuity growth rates range of 2.0% to 3.0%; and (iv) the total number of fully diluted outstanding shares of ILG.  *See* Proxy at 81.

38.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis—Pro Forma Combined Company; Implied Premium*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 10.0% to 11.5%; (ii) the range of the pro forma combined company's illustrative terminal values as of June 30, 2022; (iii) the inputs and assumptions underlying the calculation of the perpetuity growth rates range of 2.0% to 3.0%; and (iv) the total number of fully diluted outstanding shares of the pro forma combined company. *See* Proxy at 83.

39.     With respect to Goldman Sachs' *Illustrative Present Value of Future Stock Price Analysis—ILG Standalone*, the Proxy fails to disclose the following key components used in their analysis: (i) theoretical future enterprise values for ILG at the end of the calendar years 2018 through 2021; (ii) the estimate of ILG's future net debt; (iii) the total number of fully diluted outstanding shares of ILG; and (iv) the inputs and assumptions underlying the calculation of the discount rate of 11.4%.  *See* Proxy at 82.

40.     With respect to Goldman Sachs' *Illustrative Present Value of Future Stock Price Analysis—Pro Forma Combined Company; Implied Premium*, the Proxy fails to disclose the following key components used in their analysis: (i) theoretical future enterprise values for the pro forma combined company at the end of the calendar years 2018 through 2021; (ii) the estimate of the pro forma combined company's future net debt; (iii) the total number of fully diluted outstanding shares of the pro forma combined company; and (iv) the inputs and assumptions underlying the calculation of the discount rate of 12.0%.  *See* Proxy at 83-84.

41.     With respect to Moelis' *Discounted Cash Flow Analysis* for ILG, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 9.5% to 11.0%; (ii) the range of ILG'S estimated terminal values; (iii) the inputs and assumptions underlying the calculation of the perpetuity growth rates range of 1.1% to 3.7%; and (iv) the total number of fully diluted outstanding shares of ILG.  *See* Proxy at 91.

42.     With respect to Moelis' *Discounted Cash Flow Analysis* for MVW, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 9.5% to 11.0%; (ii) the

range of MVW's estimated terminal values; (iii) the inputs and assumptions underlying the calculation of the perpetuity growth rates range of 1.8% to 4.2%; and (iv) the total number of fully diluted outstanding shares of MVW.  *See* Proxy at 92-93.

43.     With respect to Moelis' *Pro Forma Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) the pro forma company's net debt; and (v) the total number of fully diluted outstanding shares for the pro forma company.  *See* Proxy at 93.

44.     These key inputs are material to ILG shareholders, and their omission renders the summary of Goldman Sachs' *Illustrative Discounted Cash Flow Analysis—ILG Standalone*, *Illustrative Discounted Cash Flow Analysis—Pro Forma Combined Company; Implied Premium*, *Illustrative Present Value of Future Stock Price Analysis—ILG Standalone*, and *Illustrative Present Value of Future Stock Price Analysis—Pro Forma Combined Company; Implied Premium* and Moelis' *Discounted Cash Flow Analysis* for ILG, *Discounted Cash Flow Analysis* for MVW and *Pro Forma Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow ("DCF") analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id*.  As Professor Davidoff explains:

There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash

> flows in the billions of dollars can change the discounted cash flow
> value by tens if not hundreds of millions of dollars… This issue
> arises not only with a discounted cash flow analysis, but with each
> of the other valuation techniques.  This dazzling variability makes
> it difficult to rely, compare, or analyze the valuations underlying a
> fairness opinion ***unless full disclosure is made of the various
> inputs in the valuation process, the weight assigned for each, and
> the rationale underlying these choices***. The substantial discretion
> and lack of guidelines and standards also makes the process
> vulnerable to manipulation to arrive at the "right" answer for
> fairness.  This raises a further dilemma in light of the conflicted
> nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, ILG shareholders

cannot evaluate for themselves the reliability of Goldman Sachs' and Moelis' analyses, make a

meaningful determination of whether the implied per share reference ranges reflect the true value

of the Company or was the result of Goldman Sachs' or Moelis' unreasonable judgment, and

make an informed decision regarding whether to vote in favor of the Proposed Transaction.

45.     With respect to Goldman Sachs' *Premia Paid Analysis*, the Proxy fails to disclose

the transactions observed by Goldman Sachs' in the analysis, as well as the premiums paid in

each respective transaction.  *See* Proxy at 82-83.  A fair summary of this analysis requires the

disclosure of the transactions considered and their respective premiums; merely providing the

25th Percentile, Median, and 75th Percentile premiums is insufficient, as shareholders are unable

to assess whether Goldman Sachs' considered the appropriate transactions, or, instead, only

considered transactions that were inapplicable and yielded unreasonably low premiums.  Indeed,

the summary of analysis even concedes that Goldman Sachs considered transactions "involving

U.S. target companies ***in all industries***," which, as a result, may not accurate reflect the

premiums associated in the Company's industry.  Accordingly, Goldman Sachs' *Premia Paid*

*Analysis* is materially incomplete and misleading, and the individual transactions and premiums

for each transaction observed must be disclosed so ILG shareholders can determine whether the illustrative premiums and implied per share value reference ranges set forth in the Proxy actually reflect the true value of their interest in the Company.

46.     Finally, the Proxy fails to disclose information concerning any past dealings between Goldman Sachs or Moelis, on the one hand, and ILG or MVW, on the other hand.

47.     Quantification of any fees either Goldman Sachs or Moelis has received in connection with any services performed for ILG or MVW during the past two years, in addition to the nature of such services, is material and must be disclosed pursuant to Rule 14a-9.

48.     Indeed, with respect to Goldman Sachs, the Proxy states:

On November 6, 2017, Goldman Sachs confirmed to ILG's Board that it had not recognized any fees for financial advisory and underwriting services provided by its investment banking division to MVW over the previous two years. Goldman Sachs also provided ILG's Board with a summary of the financial advisory and underwriting services provided by its investment banking division to Qurate Retail and/or certain affiliates and related entities of a significant stockholder of Qurate Retail, other than ILG, over the previous two years.

Proxy at 65.  However, the Proxy fails to fully disclose whether Goldman Sachs has performed any services for ILG or MVW during the past two years that it *expects* to receive compensation for and, if so, the nature of such services.

49.     Likewise, with respect to Moelis, the Proxy states:

Moelis has provided investment banking and other services to ILG unrelated to the Combination Transactions and in the future may provide such services to MVW and has received and may receive compensation for such services. In the past two years prior to the date of the opinion, Moelis acted as financial advisor to ILG in connection with its acquisition of Vistana Signature Experiences, Inc., which acquisition was consummated in May 2016. In connection with the Vistana acquisition, Moelis received a fee of $8,000,000 from ILG

and was reimbursed by ILG for certain expenses arising out of its
engagement.

Proxy at 96.  While the Proxy discloses the fees Moelis received in connection for its work for

ILG in connection with the acquisition of Vistana Signature Experiences, Inc., the Proxy fails to

fully sufficiently disclose whether this was the *only* prior work that Moelis has performed for

ILG and received fees in connection with and, in addition, whether Moelis has performed any

services for MVW during the past two years and, if so, the nature of such services and the

compensation received for such services.

50.     Indeed, it is imperative for shareholders to be able to understand what factors

might influence the financial advisor's analytical efforts.  A financial advisor's own proprietary

financial interest in a proposed merger must be carefully considered in assessing how much

credence to give its analysis.  A reasonable shareholder would want to know what important

economic motivations that the advisor, employed by a board to assess the fairness of the merger

to the shareholders, might have.   Especially when that motivation could rationally lead the

advisor to favor a deal at a less than optimal price, because the procession of a deal was more

important to him, given his overall economic interest, than only approving a deal at truly fair

price to shareholders.  The complete omission of any of Goldman Sachs' or Moelis' previous

compensation received in connection with the work is has performed for ILG or MVW renders

the Proxy materially incomplete and misleading.

51.     In sum, the omission of the above-referenced information renders the Proxy

materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure

of the foregoing material information prior to the expiration of the Proposed Transaction,

Plaintiff and the other members of the Class will be unable to make a fully-informed decision

regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R . § 240.14a-9 Promulgated Thereunder)**

52.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

53.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

54.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

55.     The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

56.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Defendants reviewed

and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for ILG, MVW, and the Combined Company; (ii) the valuation analyses conducted by the Company's financial advisors, Goldman Sachs and Moelis, in support of their fairness opinions; and (iii) the potential conflict of interest faced by Goldman Sachs and Moelis.

57.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to common shareholders although they could have done so without extraordinary effort.

58.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Goldman Sachs and Moelis reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by Goldman Sachs and Moelis, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details

surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review Goldman Sachs' and Moelis' analyses in connection with their receipt of the fairness opinions, question Goldman Sachs and Moelis as to the derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

59.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

60.     ILG is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

61.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable

powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

62.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of ILG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of ILG, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

64.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

66. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

67. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

68. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

69. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Enjoining Defendants and all persons acting in concert with them from

proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 31, 2018

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
        mschreiner@monteverdelaw.com

*Attorneys for Plaintiff*

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Tel.: (302) 984-3800

*Attorneys for Plaintiff*